In re Charles M. **REBHAN**, Debtor.

**CHRYSLER CREDIT CORPORATION,**
**a Delaware corporation, Plaintiff,**

v.

**Charles M. REBHAN, Defendant.**

**Bankruptcy No. 84–0417–BKC–Weaver.**
**Adv. No. 84–0286–SMW–A.**

United States Bankruptcy Court,
S.D. Florida.

Jan. 4, 1985.

---

Philip A. Allen, III, Mershon, Sawyer, Johnston, Dunwody & Cole, Miami, Fla., for plaintiff.

Robert Solone, Miami, Fla., for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SIDNEY M. WEAVER, Bankruptcy Judge.

THIS CAUSE having come on to be heard upon the amended complaint and the

Court, having heard the testimony and examined the evidence presented; observed the candor and demeanor of the witnesses; considered the arguments of counsel and being otherwise fully advised in the premises, does hereby make the following findings of fact and conclusions of law:

Chrysler Credit Corporation ("Chrysler Credit") seeks a determination that certain debts of the defendant, Charles M. Rebhan, are nondischargeable under sections 523(a)(4) and 523(a)(6) of the Bankruptcy Code, 11 U.S.C. §§ 523(a)(4) and 523(a)(6). Chrysler Credit alleges that defendant 1) committed fraud or defalcation while acting in a fiduciary capacity; 2) embezzled sales proceeds which plaintiff had entrusted to him; and 3) willfully and maliciously converted sales proceeds. These claims were tried before this Court on November 1 and 2, 1984. This Court has jurisdiction of the parties and of the subject matter of this action by virtue of 28 U.S.C. §§ 1334 and 157.

The evidence established that there is no dispute as to the creation, existence and amount of the debt for which Chrysler Credit seeks a nondischargeability finding. Defendant, Charles M. Rebhan, was the president, fifty percent owner, director and personal guarantor of an automobile dealership known as Coral Gables Imported Cars, Inc. d/b/a Kalamazoo Chrysler Plymouth (hereinafter "the dealership"), which operated in Kalamazoo, Michigan from May, 1979 until November, 1980.

Chrysler Credit financed the dealership's wholesale purchases of new and used cars in accordance with duly executed corporate resolutions and authorizations, and the defendant executed two "Continuing Guarant[ies]" through which he, as a primary obligor, guaranteed the dealership's existing and future obligations to Chrysler Credit. Each time the dealership ordered new cars, it executed a promissory note and trust agreement. Chrysler Credit was given a security interest in each car it financed as well as the proceeds of its sale,

and these security interests were duly perfected. Each trust agreement created well-defined obligations as to the handling and payment of sales proceeds to Chrysler Credit. At paragraph 3 of each agreement, the trustee agreed:

to keep the *proceeds* of any sale *separate from all other funds* and on the day of the receipt of such proceeds to transmit them to the Entruster [Chrysler Credit].

(Emphasis added).

Chrysler Credit conducted bimonthly audits of the dealership's inventory of financed vehicles to ascertain their status and whereabouts. Douglas Streng, a Chrysler Credit employee, conducted an audit of the dealership's inventory on August 27, 1980 and, as was the case with all prior audits of the dealership, no irregularities were found. On October 23, 1980 Mr. Streng again audited the dealership's inventory and discovered that the dealership had sold twelve cars out of trust, in that the cars were sold and proceeds had actually been received by the dealership, but were not paid to Chrysler Credit. Neither the dealership nor the defendant honored Chrysler Credit's subsequent demand for payment of the proceeds of the twelve cars which totaled $68,689.09.

In May of 1982, Chrysler Credit sued the defendant and his co-guarantors in North Carolina[1] on their Continuing Guaranties of the dealership's debts and obligations to Chrysler Credit, including the $68,689.09 due and owing for the twelve cars sold out of trust (hereinafter the "North Carolina action"). That action was stayed as to the defendant when he filed his voluntary petition for relief under Chapter 7 of the Bankruptcy Code, and this adversary proceeding followed.

## I.

### NONDISCHARGEABILITY UNDER SECTION 523(a)(6)

Under Section 523(a)(6) of the Bankruptcy Code, when a debtor injures a credi-

---

1. The co-guarantors are the defendant's wife, Catherine Rebhan, and his brother and sister-in-law Douglas Rebhan and Nina Rebhan.

tor by converting his property, the debt is nondischargeable in bankruptcy if the conversion was "willful and malicious." *In re Simmons,* 9 B.R. 62 (Bkrtcy.S.D.FLA. 1981); 2 *Collier on Bankruptcy,* ¶ 53.16[3] n. 35 (15th Ed.1984). A conversion is willful and malicious if done with reckless disregard for the rights of the property owner. *Tinker v. Colwell,* 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904); *In re Simmons, supra,* and "the sale of property subject to a security interest by a debtor without payment of the debt so secured is a willful and malicious conversion. *In re Goddaeus,* 1 C.B.C. 105 (W.D.Mich.1974)." *Matter of Auvenshine,* 9 B.R. 772, 775 (Bkrtcy.W.D.Mich.1981).

■ The evidence established, and the defendant did not dispute, that the cars were sold out of trust and that the sales proceeds were converted; instead, defendant attempted to avoid responsibility for the conversion by claiming that he was not actively engaged in the operation of the dealership. However, defendant is judicially estopped from denying his active participation in, and management and control of, the dealership under the doctrine of judicial estoppel: "A party is precluded from taking a position before any court which is inconsistent with a prior position taken in a judicial proceeding." *In re Holiday Isles, Ltd.,* 29 B.R. 827, 831 (Bkrtcy.S.D.Fla. 1983).

In the Defendant's verified "Motion, Answer, Counterclaim and Third Party Claim" (the "verified counterclaim")[2] filed in the North Carolina action, which was admitted into evidence at the trial of this case, the defendant alleged that both he and his brother were *"essential to the operation of Coral Gables's (sic) business and in control of same."* (Emphasis added). And in an amendment to the verified counterclaim the defendant stated that:

> *Charles* and Douglas Rebhan *as individuals* were inextricably woven into Coral Gables' [the dealership's] franchise agreement by provisions in same which required them to maintain beneficial

ownership and control of stock in [the dealership]. [The dealership's] Direct Dealer Agreement [with Chrysler Corporation] expressly stated:

> Chrysler has entered into this agreement relying on the *active, substantial and continuing personal participation in the management of [the dealership's] organization by Charles M. Rebhan* and Douglas L. Rebhan.

(Emphasis added). Defendant admits that both pleadings were filed on his behalf by his counsel of record. These admissions estop the defendant from taking an inconsistent position before this Court.

Further, the defendant's prior admissions are in accord with the testimony and evidence presented at trial. Charles Rebhan testified that his brother was primarily responsible for the dealership's management but he admitted being in contact with his brother once a month to discuss the dealership's management and affairs, including discussions in September and October of 1980. He also admitted that he had been in Kalamazoo to attend to the dealership's business in late August of 1980. Thus, the evidence, admissions and estoppel all establish the debtor's personal involvement in running the dealership.

Further, the Court finds that defendant received some of the converted sales proceeds. To circumvent Michigan law, which prohibits an automobile dealership from receiving a commission on sales of credit life insurance to auto buyers, the defendant and his brother formed T.K.R. AGENCY, INC. ("TKR") to receive commissions on the dealership's sales of credit life insurance. Their wives were TKR's nominal principals but the evidence established that defendant and his brother actually managed TKR. It was stipulated that routinely, when the dealership sold a car, it remitted any credit life insurance premiums to the insurance provider, American Way Service Corporation ("American Way"), which sent any commissions earned on the sale to TKR.

---

**2.** The verified counterclaim was verified by the defendant's brother, Douglas Rebhan.

On September 3, 1980, after the audit in which no irregularities in the dealership's inventory were found and just prior to the discovery of the sales out of trust, the dealership deviated from routine and wrote a check from its general checking account in the amount of $11,462.51 *directly* to TKR. And, on September 29, 1980, TKR wrote four checks, totaling $11,800.00 of which two were made payable to defendant's wife, Catherine. The defendant admitted personally receiving both of these checks, signing his wife's name to them and depositing them in his joint bank account.

Considering these facts together with the North Carolina admissions and the evidence establishing defendant's involvement in the dealership's management and conversion of the sales proceeds, the Court finds the debt to be nondischargeable under § 523(a)(6) of the Bankruptcy Code.

## II.

## NONDISCHARGEABILITY UNDER SECTION 523(a)(4) OF THE BANKRUPTCY CODE

Section 523(a)(4) of the Bankruptcy Code provides that an individual debtor does not receive a discharge from any debt

> for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

11 U.S.C. § 523(a)(4). Count II of the amended complaint alleges that 1) the defendant breached his fiduciary duty owing plaintiff under the several trust agreements, and 2) that the defendant embezzled the proceeds of the sales of cars financed by plaintiff. These claims are both independent and alternative.

A. Fraud or defalcation while acting in a fiduciary capacity.

■ An agreement which requires the debtor to hold the sales proceeds of financed vehicles in trust and to keep those proceeds separate under a formal, express trust, imposes a fiduciary duty upon the debtor with respect to the handling of those proceeds. The debtor's failure to pay those proceeds to the secured creditor constitutes "fraud or defalcation while acting in a fiduciary capacity" and the debt will be excepted from discharge. In *In re Simmons, supra,* the agreements required the debtor to segregate all of her dealership's sales proceeds and to hold them in trust for plaintiff. This Court held that the agreements created a formal express trust and the debtor's failure to remit the proceeds constituted fraud or defalcation while acting in a fiduciary capacity:

> Section 523(a)(4) is applicable only to fiduciaries of an express formal trust as distinct from constructive or implied trusts. The debtor held $11,500 in an express formal trust for the plaintiffs and knowingly misappropriated those funds. She knew that these funds were held by her in trust for the plaintiffs. She is indebted, therefore, in that amount for defalcation while acting in a fiduciary capacity. 2 *Collier on Bankruptcy,* ¶ 523.14.14[1][c] (15th ed.).

The Court distinguished cases granting discharges for failure to remit such proceeds where the underlying security agreement did not require the segregation of the proceeds:

> In *Matter of Graham,* Bkrtcy.D.Nev. 1980, 7 B.R. 5, 2 C.B.C. 695, 698, a colleague reached a contrary conclusion under similar facts, because: "A fiduciary relationship required a separate account."
>
> In that case none was established. In this case, one was. The fact that the debtor later commingled other funds in the trust account does not extinguish the fiduciary relationship.

9 B.R. at 65.

■ The trust agreements before the Court in the instant case created a formal, express trust as to the sales proceeds by providing that

> [t]he Trustee ... agrees to keep the proceeds of any sale *separate from all other funds* and on the day of the receipt of such proceeds to transmit them to the Entruster.

*Id.* (Emphasis added). *In re Simmons, supra,* at 65. See *Matter of Graham,* 7 B.R. 5 (Bkrtcy.D.Nev.1980) (to create formal, express trust, agreement must require segregation of proceeds). *Accord, In re Paley,* 8 B.R. 466, 3 C.B.C.2d 648 (Bkrtcy. E.D.N.Y.1981).

Defendant relies upon the case of *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), in arguing that the trust agreements could not create a formal express trust because they arose in the context of a floor plan financing agreement. The agreements in *Davis* called the borrower a "trustee" as to sales proceeds. The Court held this language to be insufficient, standing alone, to create a formal, express trust within the meaning of the Code provisions relating to nondischargeability. However, the contract documents analyzed by the *Davis* Court are not quoted in the opinion, and the Court did not consider the effect of a requirement that the sales proceeds be segregated. As *Simmons* recognizes, *Davis* does *not* support Defendant's proposition that parties to a floor plan financing agreement somehow lack the contractual capacity to enter into a formal, express trust agreement under which the trustee becomes a fiduciary as to sales proceeds.

On the basis of the trust agreements and the evidence presented, the Court finds that the trust agreements created a formal, express trust as to sales proceeds and that the defendant committed fraud or defalcation while acting in a fiduciary capacity through the appropriation of those proceeds. Accordingly, the defendant's debt to Chrysler Credit in the amount of $68,-689.09 is nondischargeable under section 523(a)(4) of the Bankruptcy Code.

B. Embezzlement of the sales proceeds of twelve cars.

■■■ Section 523(a)(4) also excepts from discharge debts arising through embezzlement. Embezzlement is fraudulent appropriation of the property of another which has been entrusted to the actor, without consent of the owner or bailor.

*Coconut Grove Exchange Bank v. Columbia Cas. Co.,* 154 F.2d 542 (5th Cir.1946); *Fla.Stat.* § 812.014(1)(b) (1983). A finding of nondischargeability under § 523(a)(4) for embezzlement does not require the existence of a fiduciary relationship. *In the Matter of Shuler,* 20 B.R. 163, 9 B.C.D. 119 (D.Idaho 1982). See *In re Talcott,* 29 B.R. 874, 878 (D.Kan.1983).

■■■ The defendant had an affirmative duty under the trust and security agreements to pay the proceeds to plaintiff and his intent to deprive plaintiff of those proceeds is inferable from the facts and circumstances of their appropriation. *In the Matter of Shuler, supra.* The defendant had the power to control the dealership and the means, incentive and opportunity to do so. Besides the evidence of the debtor's active management of the dealership, once again, defendant is judicially estopped from denying his personal participation and control. *In re Holiday Isles, Ltd., supra.* Accordingly, the Court finds that the defendant embezzled sales proceeds in the amount of $68,689.09 and that his debt to Chrysler Credit in that amount is nondischargeable under section 523(a)(4) of the Bankruptcy Code.

### III

### CHRYSLER CREDIT'S CLAIMS UNDER SECTION 523(a)(2)(B) OF THE BANKRUPTCY CODE

Subsequent to the filing of its original complaint seeking relief under §§ 523(a)(4) and 523(a)(6) of the Bankruptcy Code, Chrysler Credit sought to amend its complaint to add a third count, alleging that the defendant had made materially false representations in his financial statement, upon which Chrysler Credit had relied in extending the dealership credit on the strength of the defendant's Continuing Guaranties. Chrysler Credit thereby sought to have all defendant's debts to Chrysler Credit determined to be nondischargeable under 11 U.S.C. § 523(a)(2)(b). These debts total approximately $257,-000.00 which sum includes the $68,689.09

which this Court has determined to be non-dischargeable under §§ 523(a)(4) and 523(a)(6).

Chrysler Credit's amendments containing Count III were offered after the June 1, 1984 filing deadline for a nondischargeability complaint under Bankruptcy Rule 4007. Chrysler Credit, in its Second Amended Complaint, alleges that the claim is nonetheless timely under the doctrine of fraudulent concealment because Chrysler Credit did not learn of its cause of action under § 523(a)(2)(B) until the defendant admitted the falsity of his written financial statement during his deposition on August 15, 1984. Thus, Chrysler Credit alleges that the limitations period contained in Bankruptcy Rule 4007 did not begin to run until that date and, therefore, that its claim under § 523(a)(2)(B) is timely. *See Bailey v. Glover*, 88 U.S. 342, 21 Wall. 342, 22 L.Ed. 636 (1874).

Plaintiff's motion for leave to file its second amended complaint was argued on October 30, 1984, just two days before the scheduled trial on Counts I and II. To avoid prejudice to the defendant in permitting an amendment to be made at that time and to avoid a continuance of the trial as to Counts I and II, the Court found it necessary to deny plaintiff's motion for leave to amend at that time. However, this ruling was without prejudice. In light of the Court's findings and conclusions, the Court will schedule a separate trial on Count III, at which time Chrysler Credit may proceed with its claim alleging the nondischargeability of defendant's debt under § 523(a)(2)(B) and the timeliness of that claim under the doctrine of fraudulent concealment. Rule 42(b), F.R.Civ.P.

On the basis of counsel's oral arguments and the parties' memoranda of law, this Court finds that Chrysler Credit's claims under §§ 523(a)(4) and 523(a)(6) are separate and distinct from its yet to be tried claims under § 523(a)(2)(B). The former concern the appropriation of the sales proceeds of twelve cars, while the latter claim concerns the alleged falsity of defendant's financial statement given Chrysler Credit

more than eighteen months earlier. Pursuant to Rule 54(b), Federal Rules of Civil Procedure, and Bankruptcy Rule 7054, the Court finds that there is no just reason for delay in the entry of final judgment for Chrysler Credit on its claims for relief under sections 523(a)(4) and 523(a)(6) of the Bankruptcy Code.

## CONCLUSION

Accordingly, a separate Partial Final Judgment will be entered in accordance with these findings of fact and conclusions of law. The Court will reserve jurisdiction to award plaintiff its expenses and attorney's fees upon appropriate application.